ATTORNEY GENERAL ON RELATION OF ALANSON SHELEY AND AME P. T. BENITEAU v. THE CITY OF DETROIT, LUTHER S. TROWBRIDGE, COMPTROLLER, AND THE BRUSH ELECTRIC LIGHT COMPANY.

*Attorney General—Irregularities in municipal contracts.*

The failure of a municipal council to follow strictly the provisions of their charter in making a public contract does not warrant the State in interfering by its Attorney General to set aside the contract, if it does not appear that the council acted in bad faith and sought to usurp authority or that any loss to the public or injustice to individuals would result from the arrangement made.

Appeal from the Superior Court of Detroit. (Chipman, J.)    October 15.—October 22.

INJUNCTION bill. Defendants appeal. Dismissed.

*F. A. Baker* for complainant.

City Counselor *Henry M. Duffield, Chas. M. Swift, Otto Kirchner* and *Levi T. Griffin* for defendants.

COOLEY, C. J. The Attorney General files this information to enjoin the corporate authorities of the city of Detroit from carrying into execution a contract made by the city comptroller with the Brush Electric Light Company for lighting the streets and public places of the city for one year from and after June 30, 1884. The contract price was ninety-five thousand dollars. The information is filed in equity on the relation of two tax-payers of the city of Detroit, who aver that their proportion of the tax which must be levied for the fulfilment of the contract will exceed one hundred dollars. The ground of complaint of the contract is that the provision of the city charter which forbids the letting of contracts where the amount to be paid shall exceed two hundred dollars, except to the lowest responsible bidder after the publication of notice calling for bids, was not observed before this contract was

lot. No fraud or intentional wrong is charged against any one, and no equity set up except the failure to follow this provision of the charter.

It appears that the common council, by resolution adopted June 4, 1884, directed the city comptroller "to advertise one week for proposals for the annual contracts for the fiscal year 1884, beginning July 1, 1884, and ending June 30, 1885." A notice was accordingly published with specifications, among which was the following : " For illuminating the streets of the city, or any portion of them, with electricity, proposals for electricity to state the number of lights and to be confined to such localities as bidders may name in their proposals. Proposals for electricity to include cleaning, lighting and extinguishing. Illuminating with electricity to be during the same hours, and under the same rules, as those prescribed for gas. The bidders to make daily reports to the city gas inspector at his office."

In response to this notice the Brush Electric Light Company sent in proposals for lighting the entire city for the gross sum of $114,644 for every night in the year, and also for lighting specified portions of the city for sums named. The council examined these several proposals, and accepted one of them. No other proposition for electric lighting was sent in. Previous to this time the appropriation for street lighting had been made for the year at $95,669, and that sum had been spread upon the tax-roll for collection.

After their proposition had been accepted, the Brush Electric Light Company sent to the council a communication, proposing to so modify as to provide for lighting all the city " except the large vacant spaces which are not yet occupied " at the gross sum of $95,000. The council accepted this proposition and directed the comptroller to enter into a contract with the company according to its terms; which that officer proceeded to do. The date of the contract is June 14, 1884, and it was approved and confirmed by the council, June 20, 1884. Five days later the present relators as tax-payers filed their bill to enjoin the execution of the contract, but on applying for temporary injunction upon it, the writ was

refused upon the ground that the grievance, if any, was of a public nature, and could not be redressed in that suit. The present suit was then begun, the bill being filed July 15, 1884.

The first question that presents itself in the case is whether the State has any such interest as justifies the intervention of the Attorney General. In a pecuniary point of view the State is not interested at all; and the only ground of interference is that the city is abusing the corporate franchises which have been conferred upon it by the State. But that may be a very substantial ground. In *Attorney General v. City of Detroit* 26 Mich. 263, we said that "every misuse of corporate authority is in a legal sense an abuse of trust; and the State as the visitor and supervisory authority and creator of the trust, is exercising no impertinent vigilance when it inquires into and seeks to check it." But in the same case it was added: "Where, however, the Attorney General is to intervene in corporate affairs on behalf of the State, the abuse should be one of a substantial nature, and not of a character merely technical or unimportant. It should appear that the public has a substantial interest in the question; the right involved should be a public right, or at least not a private right merely; the wrong done or attempted, if it consist solely in a misuse or misappropriation of funds, should be either one involving questions of public policy, or, where that is not the case, the amount involved should be something more than merely nominal; something that is not beneath the dignity of the State to take notice of and protect by such proceeding. The remedy is somewhat extraordinary, and substantial grounds ought to appear to justify a resort to it."

What are the substantial grounds in this case? As we have seen, they are that the provisions of the city charter have not been followed preliminary to entering into the contract. An attempt was made to comply with them, but what was done is said to have been insufficient both in form and in substance. But bad faith is not charged, and if it were, there would be nothing in this record to justify the charge being

made. The city authorities contend now that what was done by them meets all the requirements of the charter, and that this suit is based upon an erroneous construction of its provisions. If they are mistaken in this, the mistake is no doubt an honest one; and if it is, the State has no such reason to interfere as it might have if there was an intentional perversion of the charter by way of a gradual assumption of powers which the State had never intended to grant.

If there is any public wrong in this case, it must be, so far as we can see, because public moneys are being misappropriated by payment upon an illegal contract. But as we have seen, the contract is only alleged to be illegal by reason of informalities: it had an important and necessary public purpose in view, and that purpose must be accomplished, if not by this contract, then by some other. The city, before making this contract, had calculated the cost of accomplishing the purpose at $95,669, and made provision for raising that sum. We have no means of knowing that if this contract were set aside, the city would be gainer to the extent of a dollar: it might for aught we know be a loser. What we are asked to do, then, is to set aside the contract upon the sole ground of informalities arising from an honest misconstruction of the city charter, where there has been no intentional abuse of authority, and where we cannot know that benefit will arise to the public or even to any single individual. And we are to do this, if at all, in a suit begun after the parties had entered upon the performance of the contract.

We cannot see that the State has any interest in doing this. The dignity of the State has not been insulted by the corporate action; its authority is not encroached upon; the franchises it has granted have not been intentionally abused; no trust fund raised under its authority is being diverted; and it is not shown that any citizen is being wrongfully or excessively burdened. Nothing appears in the case different from what might appear in any case where the city, in a matter involving two hundred dollars, has let a contract upon an informal or insufficient public notice. Is the Attorney General to interfere in every such case? If so, little will be

hazarded in predicting that the evils caused by interference will be greater than any which will be redressed.

In this case the Attorney General has merely allowed the use of his name by the relators for the purposes of an adjudication upon the legal questions. But we do not think anything appears in the facts of this case rendering it necessary or useful that any such adjudication should take place. It is not best, as a rule, that the State should make itself a party to local controversies, for they will be better settled by the people immediately concerned without its aid than with it. There are some exceptional cases, but this does not appear to be one of them.

The information should have been dismissed at the cost of the relators, and it will be so ordered now.

The other Justices concurred.