HORNER v. CITY OF EATON RAPIDS.

1. MUNICIPAL CORPORATIONS — ELECTRIC LIGHTING — USE OF STREETS.

The fact that individuals, after obtaining a contract from a city to light by electricity certain of the public streets, are permitted, without protest, to light a few private business houses along the line of such streets, will not entitle them, when, at the expiration of their contract, they are directed by the city to remove their poles and fixtures, to set up rights in the streets based upon the private lighting.

2. SAME—CHARTER PROVISIONS—EASEMENTS.

A charter provision giving to the common council of a city the right to provide for the public lighting of the streets confers no power on the council to grant a perpetual easement in the streets for the maintenance of poles and wires for use in private lighting.

Appeal from Eaton; Smith, J. Submitted October 25, 1899. Decided December 2, 1899.

Bill by Charles S. Horner and Edward E. Horner to restrain the city of Eaton Rapids from removing from the streets complainants' electric-light poles and fixtures. From a decree for complainants, defendant appeals. Reversed.

Complainants, in 1888, owned a water-power in the defendant city, with which they operated a woolen mill. The population of the city was about 2,000. The records of the common council for April 24, 1888, show the following:

"Petition of Horner Brothers, asking permission to set poles and string wires in public streets and alleys, was received and read. A proposition was received from C. S. and E. E. Horner to light the public streets by electric light, arc lights, for the consideration of seventy dollars for the light per year for six or more lights, and to keep same in good condition at their own expense; settlement and payments to be made monthly. Alderman Hamilton moved that the chairman be authorized to appoint a committee to whom shall be referred the proposition of Horner Brothers for investigation. Motion prevailed. Chairman appointed as such committee Aldermen Hamilton, Springer, and West. Motion that the petition of Horner Brothers to set poles and string wire in streets be referred to the city committee. Motion prevailed."

At a meeting on May 8th the committee reported:

"Your committee to whom was referred the petition of Horner Brothers for the privilege of erecting poles in the streets and alleys of the city, upon which to string electric-light wires, have had the same under consideration, and are in favor of allowing the privilege asked for; the poles to be erected under the full direction of the committee on streets. * * * Alderman West moved that Horner Brothers be granted the permission of placing poles and wires in the streets, under the full supervision of street committee, which motion prevailed."

At the same meeting the committee to whom was referred the proposition of complainants to light the streets asked further time for consideration, which was granted. On May 22d the committee reported, recommending a contract to be made with Horner Brothers for lighting the streets, and fixing the location of each light. The report was amended, and as amended adopted. That proposition was not accepted by complainants, and on June 15th, at a special meeting of the council, another resolution was

passed, fixing terms for lighting the city, and providing that, if it be accepted by complainants, a contract should be drawn. A committee was appointed to prepare such contract. The contract was reported June 19th, and ratified. That contract ran for one year. At various times subsequently, petitions were presented for new street lamps. Some were rejected and some granted. Meanwhile contracts had from time to time been executed between complainants and the city for lighting its streets, one of such contracts running for the period of five years. On August 31, 1898, the city, having made a contract with another party for lighting its streets, notified complainants that their contract then existing was terminated, and that they must remove their poles, wires, and lamps within 10 days, and that the new company had been granted permission to erect and maintain its poles and wires in the same places as those which were then in use by the complainants. Complainants thereupon filed this bill to enjoin the city from removing their poles, etc.

Complainants claim that their plant cost them from eight to ten thousand dollars, which includes the cost of the dam and remodeling the flume. They are using the same dynamo which was originally put in. There is no testimony of the value of this plant at the time of instituting the suit. One of the complainants testified that he did not know what it is worth today. There is therefore no evidence of the actual damage which complainants will suffer by being compelled to remove their poles and wires from the streets. They had already removed their lamps, for it appears conceded that their contract with the city was properly terminated. The plant had a capacity for 30 lamps, of which 21 were used in lighting the city when the above notice was served. They had made no extensions except as required by their contract with the city, had never extended their system into the residence portion of the city, and had only lighted a few buildings along the streets used for city lighting. They bought the dynamo, and were preparing to erect their plant, three months

before they had any permission from, or contract with, the city. The lamps for lighting the streets were put in and started before any were used for private lighting. One of the complainants testifies that at one of the meetings of the common council the question of whether they were to have the exclusive right to do commercial lighting, and whether they would install a plant for doing the public lighting alone, was discussed. The case was heard upon pleadings and proofs, and decree entered for complainants, declaring that they had the right to maintain their poles and wires as now existing in the streets, and giving them a perpetual right to use the same.

*J. B. Hendee* (*Huggett & Smith*, of counsel), for complainants.

*Fred J. Slayton*, City Attorney (*Russell C. Ostrander*, of counsel), for defendant.

GRANT, C. J. (*after stating the facts*). Did the petition, the permission granted by the council, the erection of the poles, the lighting of the city under the several contracts for nearly 11 years, and the use made of them to furnish light to a few private business houses, create a permanent contract between complainants and the city, and give them a perpetual, vested right in the streets? This is the sole question presented. If answered in the affirmative, easements in our public highways can be created in a very loose manner, and rest upon very slight foundations. Complainants had acquired no franchise from the State. Those cases (and many are cited by complainants) holding that where the State has granted to corporations the right to use the public highways for telegraphic and telephonic purposes, and the municipalities, under the authority vested in them, have by general ordinance provided for their erection so as not to interfere with or injure the public, contract relations exist, which the municipalities cannot afterwards take away, do not apply to this case. Complainants have only such rights

as the common council had the power to grant. It is important to determine first just what was granted. Complainants concede that they have no perpetual contract with the city for lighting, and that they have no rights based upon such contracts. If, therefore, the permission granted to erect these poles was granted upon the basis of contracts to light the streets of the city, complainants could be compelled to remove them when such contracts were at an end. They do not claim a right to extend their lines beyond those actually in use, and the decree so limits them. Their claim, therefore, of perpetual, vested rights, must rest entirely upon the proposition that they obtained permission to put in a commercial electric-lighting plant, and that the city lighting was incidental to that. The records of the common council contain not a word to indicate that the proposition was so understood by the council. Public policy requires record evidence of the actions of common councils in municipal matters. They cannot rest in parol. The sole testimony in this case is the loose testimony of one of the complainants that there was a talk before the council about commercial lighting, and their having the exclusive right to do it. Complainants themselves did not understand that they were obtaining vested rights in the streets. Complainant Edward testified: "I never considered it in the light of a perpetual right at all; never claimed to have a perpetual right." Complainants had no contracts with any one prior to the erection of the poles. They undoubtedly erected their plant upon the belief that they would be able to make contracts with the city, and the first lighting was done for the city. That complainants may have intended to do some commercial lighting was no concern of the city, and was not binding upon it. The fact that they stretched other wires along their poles, and extended them into a few business houses, without protest from the city, gave them no rights, nor is it any evidence of what the original contract was. For 11 years they made no extensions except as ordered by the city. We

think it entirely manifest that the common council dealt
with the complainants upon no other basis than that of
furnishing lights for the city.    Their conduct for 11 years
renders this conclusion apparent.    The furnishing of light
to private citizens was merely incidental.

The control of the public highways is in the State, and
not in the municipalities.    Municipalities have only such
control over the streets and highways as is conferred upon
them by the legislature, either by express enactment or by
necessary implication.    In a recent and very carefully-
considered opinion, written by my Brother MONTGOMERY,
we held that "the power of a municipality to grant an
easement in the street to a street-railway company is not
inherent, but is derived from the legislature." *Detroit
Citizens' St. Ry. Co.* v. *City of Detroit,* 110 Mich. 384
(35 L. R. A. 859, 64 Am. St. Rep. 350).    See, also, *City
of Detroit* v. *Detroit City Ry.. Co.,* 76 Mich. 425.
When, therefore, private parties claim permanent ease-
ments in the streets, they must show clear title.    There is
no presumption in their favor.    The presumption is against
them.    The right to erect poles in the public highway is
as much an easement as the right to lay tracks for a street
railway.    No authority is found in the charter of the de-
fendant for granting perpetual easements in its streets.
The charter provisions relied upon are those giving power
to the common council "to control and regulate the setting
of awning and other posts and shade-trees in the streets
and other public places in said city" (Act No. 347, Local
Acts 1881, § 16), and "to provide for the public lighting
of said city with gas or otherwise" (Id. § 12).    Under
these provisions the city undoubtedly had the power to
contract with complainants to light the city.    *Putnam* v.
*City of Grand Rapids,* 58 Mich. 416; *Attorney General*
v. *City of Detroit,* 55 Mich. 181.    But these cases are no
authority for granting perpetual easements in the streets
under the provisions of this charter.    *Stevens* v. *City of
Muskegon,* 111 Mich. 72 (36 L. R. A..777), does not
apply.    The improvement by the construction of a sewer

in that case was a permanent one, and was so intended. The public health of the city demanded it. The city had authority to provide for the construction of sewers. There was no contract for its use for a specified time upon payment of a certain amount by the city. The city was relieved from taxation. It received a sufficient consideration for the rights granted to Stevens. *Chicago Municipal Gas Light & Fuel Co.* v. *Town of Lake*, 130 Ill. 42.

Decree reversed and bill dismissed, with costs of both courts.

The other Justices concurred.